FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 3 0 2013 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LYNNE KRUGER, MAXWELL KRUGER,
LAWSON KRUGER, and SHELDON KRUGER,

               Plaintiff,

      -against-

VIRGIN ATLANTIC AIRWAYS, LIMITED,

               Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-2954 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

     Lynne Kruger ("Mrs. Kruger"), Sheldon Kruger ("Mr. Kruger"), and their adult sons

Maxwell and Lawson Kruger filed this action alleging breach of contract, false arrest, malicious

prosecution, intentional infliction of emotional distress, negligence, and loss of consortium

against Virgin Atlantic Airways, Limited ("VAA"). The court received a motion for summary

judgment from both Defendant and Plaintiffs. The court referred both motions to Magistrate

Judge Reyes for a Report and Recommendation ("R&R"). On August 13, 2013, Judge Reyes

returned his Report and Recommendation to this court. (R&R (Dkt. 48).) Plaintiffs objected to

portions of the R&R, and their objections are now before the court. For the reasons explained

below, Magistrate Judge Reyes's Report and Recommendation is ADOPTED.

## I.    BACKGROUND

### A. Facts

     Except where otherwise noted, the following facts are undisputed. On August 22, 2010,

Plaintiffs bought four non-refundable round-trip tickets for a family vacation. They planned to

travel on Virgin Atlantic Airlines from Newark, New Jersey, to Delhi, India via London. (R&R

at 2.) All tickets were e-tickets purchased online and subject to VAA's Conditions of Carriage.

(Id.) Plaintiffs' departure flight from Newark was originally scheduled for December 23, 2010. (Id.) On December 21, 2010, Defendant informed Plaintiffs via e-mail that their flight from Newark to London's Heathrow Airport had been cancelled due to "on-going runway restrictions" at Heathrow. These restrictions were the result of a snowstorm in London. (Id.) Plaintiffs attempted to book another VAA flight to London, but were unsuccessful. Ultimately, they booked flights to Bermuda and then to London's Gatwick Airport, from which they were able to travel to Heathrow. (Pl. Obj. to R&R (Dkt. 49) at 6.) They then used their existing tickets to fly with VAA from London to Delhi. (R&R at 2.)

Plaintiffs took their planned January 9, 2011, return flight from Delhi to London on VAA No. 301. (Id. at 3.) The flight from Delhi was divided into different sections, "upper class," premium economy, and economy. (Id.) Plaintiffs were seated in economy class. Plaintiffs' section of economy was set to deplane through a door in the middle of the aircraft, the L2 door. But economy and premium economy passengers were not allowed to disembark until after the upper class passengers had left the plane. (Id.) Due to delays in Delhi, the flight arrived late. (Skinner Decl. in Supp., Ex. 5 to Def. Mot. for Summ. J. (Dkt. 42) ¶ 8 ("Skinner Decl.").) Plaintiffs were anxious to make their connecting flight, VAA No. 17, to Newark. (L. Kruger Dep., Ex. 1 to Pl. Mot. for Summ. J. (Dkt. 43) at 40-44 ("L. Kruger Dep.").)

Mrs. Kruger was seated in row thirty-eight of the economy section. When the plane landed, she was the first passenger from the economy and premium economy sections to reach the L2 door. (R&R at 3.) Leanne Skinner was working as a flight attendant on flight 301, and was charged with watching the L2 door and insuring that upper class passengers had priority in leaving the plane. (Id.) Mrs. Kruger asked Ms. Skinner if she could disembark before the upper class passengers in order to make her connecting flight. Ms. Skinner said no. (Id. at 4.) Mrs.

2

Kruger asked repeatedly if she could pass, receiving the same response. (Id.) Finally, the upper class passengers had all departed, and Ms. Skinner stood aside to let the economy and premium economy passengers through. (Id.) Parties disagree about whether VAA announced that it was holding the plane to Newark. (Compare L. Kruger Dep. at 42:5-14, with Skinner Decl. ¶ 8.)

As Mrs. Kruger exited the aircraft, her shoulder came into contact with Ms. Skinner's chest. (R&R at 4.) Ms. Skinner claims to have been in pain and that she sat down while the rest of the passengers left the plane. (Id.) At her request, the captain of the aircraft called the police. (Id.)

Ms. Skinner and VAA accuse Mrs. Kruger of intentionally "barg[ing]" into Skinner and calling her a "bitch." (Id.) Mrs. Kruger maintains that she tripped, and she believes that she may have been intentionally tripped by Skinner. At her deposition, she testified: "I don't know if it was the flight attendant that tripped me. All I know is that when I stumbled, I saw a blue flight attendant shoe." (Id.) After the incident, Mrs. Kruger joined her family heading towards Gate 22 for their connecting flight.

Plaintiffs stopped at a transfer counter. They handed over their passports and boarding passes to a VAA staff person. Another staff member picked up their documents and walked them to the gate. (Id. at 5; see also S. Kruger Dep., Ex. 8 to Pl. Mot. for Summ. J. at 33:13-17, 37:20-24, 38:22-25 ("S. Kruger Dep.").) Gate 22 consists of a glass-enclosed seating area, from which passengers can directly board the plane, and a check in desk at the entrance to the area. (Def. Reply in Opp'n (Dkt. 50) at 6.) Passengers cannot enter the interior area without checking in at the desk. (Brunning Decl. in Supp., Ex. 6 to Def. Mot. for Summ. J. ¶ 5.)

Mr. and Mrs. Kruger might have been in line to check in to the Gate for a short while. (R&R at 5; S. Kruger Dep. at 39:11-12.) Defendant's staff stopped them. (Id.) They informed

3

Mrs. Kruger that the police wanted to question her in connection with the incident with Ms. Skinner. Ms. Skinner had also walked to Gate 22 and was there, with police, when the Krugers arrived. (Id.) After questioning both Ms. Skinner and Mrs. Kruger, police told Mrs. Kruger that they wanted to speak with her further at the station. (Id.) The rest of the Kruger family was free to leave. The Krugers' sons, Maxwell and Lawson, boarded flight 17 as scheduled. Mr. Kruger decided that he could not leave the U.K. without his wife. (Id.) All four of the family's bags were checked under Mr. Kruger's name; they were off-loaded because he was not travelling on the flight. (Id.) Plaintiffs assert that Defendant's staff handled this transaction in a harsh and abusive manner, calculated to shame and scare them. (Second Am. Compl. (Dkt. 23) ¶ 48.)

Police arrested Mrs. Kruger. (R&R at 5.) She was not placed in handcuffs or physically restrained. (Id.) The police then drove her and Mr. Kruger to the police station in a police van. Mr. Kruger waited at a nearby hotel while police questioned Mrs. Kruger. After approximately five hours, police released Mrs. Kruger in the early hours of the morning. (Data Protection Act Request (Kruger arrest record), Ex. 7 pt. 3 to Pl. Mot. for Summ. J.) She was not charged with any crime. (Id.)

Mr. and Mrs. Kruger returned to the United States on a British Airways flight later that day. (Id.) As a "customer relations gesture," Defendant refunded the $400.06 cost of Mr. Kruger's ticket from London to Newark. (Id. at 5.) Defendant sent Mrs. Kruger a letter banning her from any future travel with the airline. (Id. at 6.) On April 12, 2012, Defendant refunded the cost of the Krugers' outbound, Newark to Heathrow flight, in the amount of $1,414.20. (Id.)

Mrs. Kruger states that she has been seriously psychologically affected by the arrest. (Second Am. Compl. ¶¶ 48-49). She was taken to the hospital for a panic attack on July 3, 2011. (L. Kruger Dep. at 112:20-116:8.) She describes her relationship with her husband as severely

4

strained. (Id. at 159:19-24.) A psychologist who treated her for a period in 2011 describes a number of anxiety-related ailments and states that "[a]ll of her symptoms are consistent with the condition of Post-Traumatic Stress Disorder." (Olson Ltr., Ex. 10 to Pl. Mot. for Summ. J.)

### B. Procedural History

The Krugers filed this lawsuit against VAA and Jane Doe 1 (later identified as Ms. Skinner), as well as VAA employees Paul Brunning and Andrew Blackwell. (Compl. (Dkt.1).) They alleged breach of contract, negligence, loss of consortium, intentional infliction of emotional distress, false arrest, and false imprisonment. (Id.) Plaintiffs later amended their complaint to remove all claims against individual defendants, leaving VAA as the sole defendant. (First Am. Compl. (Dkt. 3).)

Plaintiffs filed motions for a pre-motion conference to request partial summary judgment and to amend their complaint on February 28, 2012. (Mot. for Pre-Mot. Conf. (Dkt. 17); Mot. to Amend (Dkt. 18).) Defendant opposed the motion because discovery was not yet complete. (Resp. in Opp'n (Dkt. 21).) The court referred the issue to Magistrate Judge Reyes for an R&R. (Feb. 29, 2012, Referral.) On June 14, 2012, Plaintiffs filed a second amended complaint to add a claim for malicious prosecution. (Second Am. Compl.)

Following further discovery, the parties moved for summary judgment on January 4, 2013, (Defendant) and January 11, 2013, (Plaintiffs). (Dkts. 42-43.) Judge Reyes issued his R&R recommending that Defendant's motion for summary judgment be granted and that Plaintiffs' motion be denied on August, 13, 2013. Objections to the R&R were listed as due on August 30, 2013, and Plaintiffs filed their objections on that date. On September 5, 2013, Defendant filed its reply. (Dkt. 50.) Defendant later filed a motion to withdraw the timeliness of objections argument contained in its original reply. (Dkt. 51.)

5

## II. STANDARD OF REVIEW

The court reviews portions of the R&R to which a party makes no objection for clear error. U.S. Flour Corp. v. Certified Bakery, Inc., No. 10-CV-2522 (JS), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012). If one of the parties objects to a portion of a magistrate judge's R&R, the court reviews that portion de novo. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. Pro. 72(b)(3). However, if the objections are "merely conclusory or general" or "simply reiterate his original arguments" those objections need only be reviewed for clear error. Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (citation omitted). A district court will ordinarily refuse to consider new arguments, evidence, or law that could have been, but was not, presented to the magistrate judge. Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 995 (1st Cir. 1988); Gutman v. Klien, 03-CV-1570 (BMC), 2008 WL 5084182, at *1 (E.D.N.Y. Dec. 2, 2008); Kennedy v. Adamo, 02-CV-1776 (ENV), 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006) (citing Haynes v. Quality Markets, 02-CV-250, 2003 WL 23610575, at *3 (E.D.N.Y. Sept. 22, 2003)). "A proper objection is one that identifies the specific portions of the R&R that the objector asserts are erroneous and provides a basis for this assertion." DuBois v. Macy's Retail Holdings, Inc., 11-CV-4904 (NGG), 2012 WL 4060586, at * 1 (E.D.N.Y. Sept. 13, 2012).

## III. DISCUSSION OF OBJECTIONS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden to make this showing rests upon the party moving for summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he court

6

must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). Both parties in this case made motions for summary judgment. Since the R&R primarily concerns Defendant's motion for summary judgment, Plaintiffs are the non-moving party.

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]pecific facts" grounded in testimony or other admissible evidence create a genuine issue. Id. "[M]ere allegations or denials" of the adverse party's pleadings, id., "assertions that are conclusory," Patterson v. Cnty. of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004), or "conjecture[] or speculation" from the non-movant, Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), do not.

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323 (citation omitted).

### B. Plaintiffs' Objections

Plaintiffs first object that Magistrate Judge Reyes did not hold hearings before issuing his report. (Pl. Obj. to R&R at 5). Plaintiffs also object to three portions of Judge Reyes's R&R: (1) the determination that Virgin had no obligation to cover, (2) the rejection of the EU law claim,

7

and (3) the application of the Montreal Convention. (Id. at 6-25). Finally, they make a number of other observations that could be loosely construed as objections. (Id. at 25-26).

### 1. Hearings

Plaintiffs' procedural objection regarding evidentiary hearings lacks foundation. (See id. at 5.) Although a judge may give a party that fails to properly support a material fact, or fails to address another party's assertion of fact, the opportunity to correct this failing, the judge is under no obligation to do so. Fed. R. Civ. Pro. 56(e). Plaintiffs and Defendant had sufficient time for discovery and had the opportunity to submit exhibits to accompany their summary judgment motions. The record reflects that they made ample use of this opportunity. Magistrate Judge Reyes held multiple conferences with the parties throughout this process. The Magistrate Judge also held a pre-trial conference on September 28, 2012. (Minute Entry for Sept. 28, 2012). The detailed R&R in this case demonstrates that Magistrate Judge Reyes had the necessary resources with which to determine that no genuine issues of material fact remained for trial. The court accordingly finds that Plaintiffs' objection with regard to additional hearings or evidence is without merit.

### 2. Breach of Contract

Plaintiffs make two assertions of error with regard to the breach of contract claim for the outbound flight: (1) that Defendant had an obligation to cover, and not merely to compensate Plaintiffs, for the cancellation of the Newark to London flight, and that it should have booked an alternative flight to London for Plaintiffs, and (2) that the issue of whether snow caused the flight cancellation remains an issue of fact.

Plaintiffs also made breach of contract claims regarding their inbound flight from Heathrow to Newark. However, Plaintiffs raise no objection to the Magistrate Judge's

recommendation that Defendant did not breach its contract with regard to carriage of their

baggage, or with regard to refunds for Mr. and Mrs. Kruger. Having found no clear error in

these recommendations, the court adopts them. All that remains is to examine the Magistrate's

recommendations regarding the outbound, Newark to London, flight.

### a. Defendant's Obligations

Plaintiffs contest Judge Reyes's determination that VAA's contract of carriage did not

require it to find Plaintiffs an alternate flight. They argue that, because they found another way

to get to London, Defendant must pay the difference between the contract price and the cover

price, as if they were engaging in a sale of goods covered by the Uniform Commercial Code.

(See Pl. Obj. to R&R at 6.) However, parties had a contract for carriage, rather than for the sale

of goods, and the Defendant's obligation was that of a common carrier, not a seller.

The fact that Plaintiffs were able to obtain alternate carriage to another airport in London

is irrelevant to the legal question of whether Defendant was obligated to obtain it for them. The

terms of the contract between Plaintiffs and Defendant are contained in the Conditions of

Carriage, which is the only part of Defendant's customer service website referenced on the e-

ticket. (E-ticket, Ex. A to Second Am. Compl. at 3 ("Notice of Incorporated Terms of

Contract").) The court notes that the conditions of carriage provided to it appear to be from

2012, but that Plaintiffs purchased their tickets in 2010. Given that neither party has objected to

the use of the 2012 contract, the court assumes that the relevant language is the same as the

language in the 2010 contract in all material respects. The relevant language states that if a flight

is cancelled, VAA offers customers a choice: either it will refund the cost of the flight, re-route

the customer at a later date, or, if possible re-route a customer, "on our earliest flight with

suitable space available in the ticket class of service for which you have paid the fare, or at our

option in comparable transport conditions." (Conditions of Carriage, art. 9.3.1.1(b), Ex. B to Carlsen Decl., Ex. 8 to Def. Mot. for Summ. J. ("Conditions of Carriage").) Defendant had no available flights that would have allowed Plaintiffs to make their connection. (R&R at 12; Wallace Decl. in Supp., Ex 9 to Def. Mot. for Summ. J. (Dkt. 42) ¶ 6.)

### b. Weather Cancellation

Although Plaintiffs claim that the issue of whether snow caused the flight cancellation is in dispute, they offer no evidence to support this claim. If the non-moving party objects to summary judgment on the grounds that an issue of fact exists, the objection must be based on more than mere "conjecture." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996). Plaintiffs have adduced no evidence demonstrating that flights were not cancelled due to snow in London. The fact that some flights could go to London area airports does not mean that all flights could go to Heathrow as scheduled. Simple denials that snow was the cause of the flight cancellation, (Pl. Obj. to R&R at 7), do not amount to a genuine issue of material fact.

Therefore, the court adopts Magistrate Judge Reyes's recommendations regarding these contract issues in full.

### 3. EU Regulation 261/2004 Claim

Plaintiffs also contest the Magistrate Judge's determination that European Community Regulation 261/2004 is inapplicable to the cancellation of their outbound flight.[1] This regulation gives passengers on EU airlines a right to compensation for cancelled or delayed flights in some circumstances. Council Regulation 261/2004, 2004 O.J. (L46) 1 (EC). Plaintiffs seem to have misread the R&R to suggest that foreign law claims are preempted by U.S. federal law. It is helpful for the court to clarify here that the federal preemption issue discussed by the Magistrate

---

[1]     This regulation is referred to in the papers as EU Regulation 261. It is actually a European Community regulation, enacted before the 2009 Treaty of Lisbon under which the European Community was absorbed into the EU.

Judge applies to Plaintiffs' state law claims. In particular, Plaintiffs have claimed that, under the law of New York State, Regulation 261/2004 is incorporated by reference into their contract with Defendant. (Pl. Obj. to R&R at 7 (referring to "cross references in the Virgin contract of carriage.").)

Plaintiffs cannot bring a direct state-law claim because the Airline Deregulation Act ("ADA") preempts state laws regulating airline rates. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228 (1995). But they can bring a claim related to anything that Defendant explicitly incorporates into its contract. Id. at 228-29. State law thus provides no cause of action, but can be a guide to interpreting the contract. This leads to the difficulty of determining what law applies to the document.

Curiously, it has not been clearly established that New York law governs this contract. The contract that parties have provided to this court contains no choice of law clause. (See Conditions of Carriage.) Federal courts sitting in diversity cases typically follow the law of the forum on issues of substantive law. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). However, the Second Circuit has held that federal common law choice-of-law analysis applies to international air shipments. Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 80-81 (2d Cir. 2007). Although the present case involves the transit of passengers and not goods, a similar rationale applies because this area of law is also governed by international convention and involves similar modalities of contracting and transport. In any event, the choice of law presents little difficulty as New York and federal law on choice of law do not conflict. Under both federal common law and New York state choice of law rules, the court applies an interest analysis. Id. at 81(citing In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir.

1992)); <u>Vumbaca v. Terminal One Group Ass'n L.P.</u>, 859 F.Supp. 2d 343, 360-61 (E.D.N.Y. 2012).

An interest analysis suggests two options for the law governing the contract, neither of which is New York law. The parties' contract was made over the internet. (R&R at 2.) Performance was to begin in the United States, specifically, Newark, New Jersey. Arguably, New Jersey law applies because the flight would have originated from that state. In that case, the Conditions of Carriage would be governed by New Jersey law, except as preempted by U.S. federal law, including the ADA. Another obvious candidate is the law of England and Wales, and through it, that of the European Union. The Community Regulation applies to passengers departing a non-member state when the airline is an EU carrier. Council Regulation 261/2004, art. 3, 2004 O.J. (L46) 1, 3 (EC). It is mandatory and cannot be contracted around. Council Regulation 261/2004, art. 15.1, 2004 O.J. (L46) 1, 6 (EC). Second Circuit precedent directs the court to the Restatement of Conflicts of Laws. <u>Eli Lilly</u>, 502 F.3d at 81. The Restatement suggests that the law of the place of departure, New Jersey, would apply to the contract. <u>Rest. 2d Confl.</u> § 197.

The court need not resolve this question today because it does not affect the outcome of the case, or the correctness of the Magistrate Judge's ultimate determination. Even if New Jersey law would require that the regulation be incorporated by reference, or if the law of England and Wales applied to this contract, Regulation 261/2004 would be inapplicable here.

Plaintiffs cannot recover under Regulation 261/2004 because the text of the regulation states that airlines need not provide compensation in the case of: "extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken." Council Regulation 261/2004, art. 5.3, 2004 O.J. (L46) 1, 4 (EC). The European Court of Justice, the

12

highest court of EU law,[2] has ruled that such circumstances include "an event which is not inherent in the normal exercise of the activity of the carrier concerned and is beyond the actual control of that carrier on account of its nature or origin." Case C-549/07, Wallentin-Hermann v. Alitalia - Linee Aeree Italiane SpA., 2008 E.C.R. I-1106; see also Case C-12/11, Judgment of the Court (Third Chamber) McDonagh v. Ryanair Ltd., Jan. 31, 2013, available at http://curia.europa.eu.

A snow-related cancellation is clearly beyond an airline's actual control and thus is an extraordinary circumstance, unlike, for instance, a controllable mechanical failure. See Case C-12/11, McDonagh, ¶ 29. Because the cancellation was an extraordinary circumstance under the terms of Regulation 261/2004, Defendant is not obligated to compensate Plaintiffs under the Regulation. As discussed above, Plaintiffs dispute the fact that snow caused their flight to be cancelled, but offer no evidence to back up this assertion. Because the court adopts the view that extraordinary circumstances prevented Plaintiffs from taking their original flight, it need not treat the question of whether they would need to exhaust administrative remedies. (See R&R at 16); but see Case C-12/11, McDonagh, ¶ 22 (existence of administrative process does not affect standing to sue carrier under the regulation).

Regardless of whether Regulation 261/2004 applies, Plaintiffs would not be entitled to compensation. The court adopts the Magistrate Judge's recommendation that a snowstorm

---

[2]    The court was concerned to see that Plaintiffs submitted the opinion of Advocate General Bot, and not the judgment of the court, in the McDonagh case. The advocate general is a position that derives from the French legal system, and has no close analogue in our own. He or she represents neither of the parties, but instead provides an independent opinion to the court. Sometimes, the court's holding will adopt an advocate general's opinion explicitly; sometimes, it is implicitly understood that the opinion is guiding the court's reasoning; and sometimes the European Court of Justice and the advocate general will disagree. Thus, although the opinion of an advocate general can be valuable in interpreting a court judgment, it is not equivalent to one. If submitted to this court as evidence of EU law, it should be accompanied by the judgment of the court. See Michel Bobak, A Fourth on the Court: Why are There Advocates-General on the European Court of Justice?, 14 Cambridge Y.B. of Eur. Legal Stud. 529 (2011) (explaining the history and current form of the advocate general).

13

presents an "extraordinary circumstance" excusing Defendant from liability under terms of the Regulation. (R&R at 16.)

### 4. Application of the Montreal Convention

Finally, Plaintiffs object to the application of the Montreal Convention. They object both to the characterization of the incident as an accident and to Magistrate Judge Reyes's determination that Mrs. Kruger was embarking on the aircraft when the incident that led to her being refused carriage and arrested, occurred. These findings trigger the application of the Montreal Convention. Convention for the Unification of Certain Rules for International Carriage by Air ("Montreal Convention"), May 28, 1999, 2242 U.N.T.S. 309, S. Treaty Doc. No. 106-45. The Montreal Convention applies to personal injuries involving international flights. For the Montreal Convention to apply, an accident must take place on the airplane or in the course of embarking or disembarking. Montreal Convention, art. 17.1. This portion of the treaty is identical to its predecessor, the Warsaw Convention, and precedents discussing this article of the Warsaw Convention are generally also applicable to the Montreal Convention. Weiss v. El Al Isr. Airlines, 433 F. Supp. 2d 361, 365 (2006), aff'd, 309 Fed. Appx. 483 (2009), cert. denied, 129 S.Ct. 2797, reh'g denied, 130 S. Ct. 32. If applicable, the Convention would preempt any state law claims. Vumbaca, 859 F. Supp. 2d at 364.

Plaintiffs' claims regarding the meaning of accident and embarkation both fail. The Convention applies to the tort claims arising out of Mrs. Kruger's arrest. Because these claims related to harm that is purely mental in nature, Plaintiffs cannot recover under the terms of the Convention.

### a. Defining Accident

The Supreme Court has defined "accident" under the Convention as "an unexpected or unusual event or happening that is external to the passenger." Air Fr. v. Saks, 470 U.S. 392, 405 (1985). The definition "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." Id.

Plaintiffs assert that the details of the incident with Ms. Skinner, the flight attendant, are contested. (Pl. Obj. to R&R at 21.) That the facts of the incident may be contested is neither here nor there. The proper question is whether the incident may be characterized as an "accident" under the Montreal Convention. Plaintiffs also point out that nothing on the London to Delhi flight constituted an accident. (Id.) This point is both correct and irrelevant, as all parties agree that the incident leading to Mrs. Kruger's arrest happened later. Mrs. Kruger's arrest as she was about to board her next flight was certainly an "unexpected and unusual event" and something courts have fairly characterized as an accident. E.g., Shen v. Japan Airlines, 918 F. Supp. 686, 688 (S.D.N.Y. 1994) (plaintiff's false imprisonment is Warsaw Convention accident), aff'd 43 F.3d 1459.

### b. The Location of the Accident

The other component of personal liability under the Montreal Convention is the location of the accident. The Magistrate Judge recommended that the court hold that Mrs. Kruger was embarking the aircraft at the time of her arrest. Plaintiffs contest this determination, claiming that Mrs. Kruger was not in the process of embarking the aircraft within the meaning of the Montreal Convention. (Pl. Obj. to R&R at 15.)

The Second Circuit uses a four-prong test to determine whether a passenger was embarking on the aircraft within the meaning of the Montreal Convention: (1) the activity of the

passengers, (2) restrictions on the passengers' movement, (3) imminence of actual boarding, (4) proximity of passengers to the gate. Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir. 1990); Day v. Trans World Airlines, Inc., 528 F.2d 31, 33-34 (2d Cir. 1975), cert. denied sub. nom, Trans World Airlines, Inc. v. Day, 429 U.S. 890 (1976), reh'g denied, 429 U.S. 1124 (1977).

### i.   Activity of the Passengers

The fact the Plaintiffs were embarking on another flight with the same airline distinguishes this case from those in which the plaintiff was flying with another airline or disembarking at his final destination. See Rabinowitz v. Scandinavian Airlines, 741 F.Supp. 441, 445 (citing Curran v. Aer Lingus, 41 Avi. Cas. (CCH) ¶ 17,560 (S.D.N.Y. 1982), for the proposition that merely directing passengers to Customs is not disembarkation). Plaintiffs went to Defendant's transfer desk and relied on Defendant's employee, who had their passports and boarding passes, to take them to their gate. See Buonocore, 900 F.2d at 10 (passenger at snack shop is not embarking).

### ii.   Restrictions on Movement

A layover can sometimes allow passengers relatively unrestricted movement, but that is not the case here. Unlike the plaintiff in Hunter, the example given by Plaintiffs, the Krugers did not have a layover of several hours. Hunter v. Deutsche Lufthansa AG, 863 F. Supp. 2d 190, 207 (E.D.N.Y. 2012) (arrest that resulted from a miscommunication during a two-hour layover is not in the course of embarking or disembarking); see also Rabinowitz 741 F. Supp. 2d at 446. They rushed to the line to board their plane, which was about to take off. These Plaintiffs were in a position similar to the plaintiff in Jefferies who was injured on her way to Gate 22 at Heathrow Airport. Jefferies was "located twelve feet from the gate room of Gate 22" at

Heathrow, which was "remotely located at the end of terminal." Jefferies v. Trans World Airlines, Inc., 85-C-9899, 1987 WL 8168, at *4 (N.D. Ill. 1987). The Northern District of Illinois found Jefferies's position close enough to warrant airline liability for her injury because her movement was restricted by her need to make her flight. Plaintiffs' movements were as, if not more, restricted. Plaintiffs state that: "On several occasions inside the terminal . . . they were stopped, and Virgin staff took their passports and tickets, immobilizing them . . . ." (Second Am. Compl. ¶ 48.) Also like Jefferies, Plaintiffs were "not in a public area. [They were] in the area that was restricted to departing passengers." Id. Finally, like Jefferies, Plaintiffs were not free to go where they wanted in the terminal without missing their flight. Id. Although they state that this action took place in "the public, general terminal," (id.) they were under the airline's control for significant portions of their journey to the gate, as well as while in waiting to cross the glass partition separating them from the gate.

### iii. Imminence of Boarding

Again, the imminence of boarding distinguishes the case from Hunter. The flight was boarding when Plaintiffs arrived at the gate. That Mrs. Kruger was denied boarding does not affect the imminence of boarding. See Marotte v. Am. Airlines, Inc., 296 F.3d 1255, 1261 (11th Cir. 2002) (flight attendant allegedly slammed door to gate as plaintiffs attempted to pass through); Matveychuk v. Deutsche Lufthansa, AG, 2010 WL 3540921, at *3 (E.D.N.Y. 2010) (plaintiff denied permission to board connecting flight); Rajcooar v. Air India Ltd., 89 F. Supp. 2d 324 (E.D.N.Y. 2000) (passenger suffered a heart attack while in line to board).

### iv. Proximity to the Gate

Their proximity to the gate also favors a finding that Plaintiffs were embarking. Although the alleged torts continued farther from the gate, the key issue in this case concerns the

actions that Defendant's employees took to effectuate Mrs. Kruger's arrest. Other district courts in New York have so held when passengers were detained, even at some distance from the airport. See Shen 918 F. Supp. at 688 (plaintiff alleged detention in hotel by airline employees because they believed that he did not have the appropriate entry visa); Singh v. N. Am. Airlines, 426 F. Supp. 2d 38 (E.D.N.Y. 2006) (plaintiff wrongfully detained when airline employee used his luggage tag to smuggle drugs); see also id. 47-48 (contrasting that case with Schroeder v. Lufthansa, 875 F.2d 613 (7th Cir. 1989) in which passenger did not allege that wrongdoing on the part of the airline led to her detention).

Mrs. Kruger was not at Gate 22 when the initial allegedly false report was made to police. (Def. 56.1 Stmt. ¶ 61.) But, as the R&R notes, Mrs. Kruger was at or near the gate when Ms. Skinner spoke with the police and when Mrs. Kruger was arrested. (R&R at 30.) Although she might have been tripped by a flight attendant while disembarking her previous flight, Mrs. Kruger complains only of torts arising from her arrest and detention. Since the check in desk for Gate 22 is the place in which alleged misconduct by the airline led to her arrest, proximity to the gate also weighs in favor of a finding that Mrs. Kruger was in the process of embarking for Montreal Convention purposes.

Having reviewed the issues de novo, the court adopts the Magistrate Judge's recommendation that it apply the Montreal Convention. Mrs. Kruger encountered an unexpected and unusual event that falls within the definition of Montreal Convention accident. The circumstances of this case also favor a finding that the Krugers were in the process of embarking under the Second Circuit's test. Plaintiffs made their way directly to Gate 22. To reach Gate 22, they went to the end of a dead-end corridor. There, they got in line to enter a special glass-enclosed area at the entrance to the Gate. Mrs. Kruger was waiting to board when she was

18

arrested. There were severe restrictions on her movement, both because airline personnel had possession of her passport and boarding pass for part of the time and because she was trying to catch a flight that was about to leave. And she was arrested at the check in desk to the area around the Gate.

### c. *Plaintiffs' Injuries*

Because the Montreal Convention governs the instant case, and the Convention preempts state law claims, it is the only source of liability for Defendant. See El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155 (1999). To recover under the Montreal Convention, a claimant has to have sustained death or bodily injury. Montreal Convention, art. 17. Courts in the United States, and abroad, have consistently read the Convention to preclude recovery for purely psychic injuries. See E. Airlines, Inc. v. Floyd, 499 U.S. 530 (1991) (drafting history of the Warsaw Convention and subsequent interpretation by the courts of various parties favors a narrow reading of "bodily injury."). Bodily injury can include "a change in the structure of an organ" Id. at 541. Recovery for mental injuries is limited to situations in which the mental injuries resulted from a physical injury to the plaintiff. Ehrlich v. Am. Airlines, Inc., 360 F.3d 366 (2d Cir. 2004).

Two of the Plaintiffs, Mr. and Mrs. Kruger, claim damages stemming from Mrs. Kruger's arrest. Mrs. Kruger alleges she felt "shock, express[ed] fear, and [became] traumatized." (2d Am. Compl. ¶ 43.) "She was humiliated and forever mentally scarred." (Id.) She has incurred expenses for psychiatric treatment and "continues to have nightmares and fear, anxiety panic attacks, and has been adversely and materially affected mentally" by Defendant's acts. (Id.) These types of injuries, standing alone, are not recoverable under the Convention.

Mrs. Kruger also asserts that she suffers from Post-Traumatic Stress Disorder (PTSD) and that PTSD can cause physical changes to the brain's structure, meeting the bodily injury standard. (Pl. Obj. to R&R at 24.) Although willing to entertain the possibility that this might be so in some cases, the Magistrate Judge correctly noted the paucity of evidence of physical injury in this case. (R&R at 35-36); see Turturro v. Cont'l Airlines, 128 F. Supp. 2d 170, 179 (S.D.N.Y. 2001) ("the case at bar parallels others in which plaintiffs have not advanced with the requisite specificity either a brain-lesion theory of PTSD or individualized proof of such lesions.").

Plaintiffs assert in their Rule 56.1 Statement that "the frontal lobes of [Mrs. Kruger's] brain are believed to be swollen and enlarged as is the case with PTSD." (Pl. Rule 56.1 Res. ¶ 111). However they do not adduce any evidence of this swelling, nor do they explain the basis for this belief. Plaintiffs now claim that, at trial, they would have introduced "brain scans" of Mrs. Kruger that they seemingly do not currently have. (Pl. Obj. to R&R at 24.) That response is not adequate given the posture of this litigation. The court is deciding motions for summary judgment, not motions to dismiss arising before Plaintiffs have had much chance to investigate. Plaintiffs first filed this action in June 2011. (Compl.) Discovery in this case closed a year ago. (See Minute Entry, Sept. 28, 2012.) Plaintiffs cannot now return to the court with vague statements that they might, at some unspecified future time, offer some future evidence that they vaguely refer to as "brain scans." See Anderson, 477 U.S. at 248. The issues they raise are not material because, they are not supported by any admissible evidence. Id. Given the evidence properly before it, the court agrees with the Magistrate Judge that Mrs. Kruger's injuries were purely mental and therefor, not recoverable under the Montreal Convention.

Mr. Kruger's claim for loss of consortium must also fail. Under Article 17 of the Montreal Convention, loss of consortium claims may be brought according to the domestic law of the contracting states. Zicherman v. Kor. Air Lines, Co. Ltd., 516 U.S. 217, 225 (1997). Because the underlying torts occurred in England, under an interest analysis, English law should be applied if it would differ from New York law. (R&R at 37 n.18.) However, both English and New York law treat loss of consortium as a derivative claim. (Id.); Argento v. Airborne Freight Corp., 933 F. Supp. 373, 377 (1996). As a result, Mr. Kruger's loss of consortium claim cannot survive summary judgment rejecting his wife's claims.

### 5. Remaining Questions

The court admits to some confusion over the final pages of Plaintiffs' Objections. (Pl. Obj. to R&R at 25-26.) Plaintiffs seem to be trying to make a general point that if this court, or a court of appeal, decides that the Montreal Convention does not apply to this case, Plaintiffs would have claims in tort and their motion for partial summary would again be relevant. (Id.) That observation is not a specific objection to any part of the R&R.

Finally, Plaintiffs seem to be under the impression that they are going to able to add a defamation claim, which they did not specifically plead and which was not brought before the Magistrate. (Id.) They state that they would move under Rule 15 to amend their pleadings at trial and that Defendant should have been aware of this. (Id. at 26.) As discussed above, Plaintiffs cannot use their objections to add a claim that was not properly before the Magistrate Judge. Haynes, 2003 WL 23610575, at *3. This type of ambush defeats the goals of the Magistrate Judge's statute—it promotes neither fairness, nor the efficient use of court time. Cf. Paterson-Leitch Co., 840 F.2d at 995. Characterizing a letter that Mr. and Mrs. Kruger received from Defendant as "defamatory" does not amount to proper notice to the Magistrate Judge and

opposing party. (See Second Am. Compl. ¶ 48.) Defamation requires that the false statement be made to third parties and that it damage the subject's reputation. Black's Law Dictionary (9th ed. 2009). Plaintiff's allegations of publicity and damage to reputation are conclusory, as they never state who the letter was published to and what the damage to Mrs. Kruger's reputation was. See Fed. R. Civ. P. 8(a)(2)-(3); (see generally Second Am. Compl.) Thus it is improper for the court to sustain such a claim as an objection the R&R.

## IV.  CONCLUSION

The court has reviewed de novo portions of the R&R subject to Plaintiff's objections. It has reviewed all other aspects of the R&R for clear error. With appropriate modification to the reasoning, the court ADOPTS the Magistrate Judge's recommendation that Defendant's motion for summary judgment be granted in its entirety. It further ADOPTS the Magistrate Judge's recommendation that Plaintiffs' motion for partial summary judgment should be denied because the grant of Defendant's motion has rendered it moot. Defendant's motion to amend its reply to objections is GRANTED. Defendant's motion for summary judgment is GRANTED. Plaintiffs' motion for partial summary judgment is DISMISSED AS MOOT.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York                        NICHOLAS G. GARAUFIS
　　　 September 30, 2013                          United States District Judge